# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT C. GORDON # 65920,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:26-cv-00046** |
| **v.** | ) | |
| | ) | **Judge Trauger** |
| **CHAD YOUKER,** | ) | **Magistrate Judge Frensley** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Robert C. Gordon, an inmate of the Williamson County Jail in Franklin, Tennessee, filed a pro se, in forma pauperis Amended Complaint under 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5, and Tennessee Code Annotated § 41-21-211, concerning the removal of his religious materials, including his Bible, and related allegations. (Doc. Nos. 6-1 at 1, 18).

By Memorandum Opinion and Order entered on May 6, 2026 (Doc. No. 18), the court screened the Amended Complaint; dismissed Plaintiff's claims under the Federal Torts Claims Act, the Spending Clause, and the Commerce Clause; determined that the Amended Complaint states viable claims under the First Amendment, RLUIPA, and Tennessee state law; directed Defendant Youker to respond to Plaintiff's Preliminary Injunction ("PI") Motions (Doc. Nos. 7, 13) on or before the deadline to file a responsive pleading or a motion to dismiss; and held Plaintiff's Motion to Join Complaints (Doc. No. 9) and Motion for Class Action Certification and Class Definition (Doc. No. 12) in abeyance pending the resolution of Plaintiff's PI motions, *inter alia*.

1

Case 3:26-cv-00046    Document 61    Filed 07/22/26    Page 1 of 30 PageID #: 1436

Pending before the court are the following motions filed by Plaintiff: four Motions for Preliminary Injunction ("PI") (Doc. Nos. 7, 13, 20,[1] 25), four Motions to Join Complaints and Consolidate (Doc. Nos. 9, 24, 29,[2] 33), Motion for Class Action Certification and Class Definition (Doc. No. 12), and a Motion to Enforce RLUIPA (Doc. No. 29).

Defendant has now responded to the Amended Complaint and Plaintiff's motions as follows: Motion for Sanctions (Doc. No. 36) to which Plaintiff has replied in opposition (Doc. No. 49), Response in Opposition to Doc. Nos. 14, 15, 16, 20, 23, 23 (Doc. No. 41), Motion to Dismiss (Doc. No. 43) to which Plaintiff has responded in opposition (Doc. No. 51), Motion to Stay (Doc. No. 45) to which Plaintiff has responded in opposition (Doc. No. 50), and Response in Opposition to Motions Doc. Nos. 9, 12, 24, 29, and 33 (Doc. No. 47). Defendant has filed Replies to Plaintiff's Responses (Doc. Nos. 54, 56) and Plaintiff has filed Objections to Defendant's Responses (Doc. Nos. 53, 60).

Herein, the court will resolve Plaintiff's Motions for TRO and Preliminary Injunction as well as Defendant's Motion to Stay.

## I. MOTIONS FOR TRO AND PRELIMINARY INJUNCTION (Doc. Nos. 7, 13, 20, 25, 29)

Plaintiff's motions generally allege that jail policies and restrictions created and implemented by Defendant have interfered, and/or are interfering with, his access to religious materials and religious exercise. In the "First Emergency Motion for PI", Plaintiff asserts that Defendant's alleged denial of physical Bibles and Alcoholics Anonymous ("AA") books violated his rights. (Doc. No. 7). Plaintiff's next PI motion asserts that his religious rights were violated when the jail placed restrictions on minister visits. (Doc. No. 13). Plaintiff's "Emergency Motion

---

[1] This motion also requests a temporary restraining order. (Doc. No. 20).

[2] Plaintiff's "Motion to Consolidate Cases, Motion to Enforce RLUIPA" (Doc. No. 29) is one motion seeking two different types of relief.

for Ex Parte TRO and PI" (Doc. No. 20) is substantially similar to an Ex Parte Motion for TRO (Doc. No. 15) already dismissed by the court. Plaintiff's "Motion for PI and Ex Parte TRO" is a compilation of his previous filings, alleging the same facts and requesting the same relief. (Doc. No. 25). Plaintiff's Motion to Enforce RLUIPA contends that his current mail restrictions and housing conditions are unconstitutional. (Doc. No. 29). In that motion, Plaintiff also requests that the court consolidate his pending cases.[3]

## A. **Plaintiff's Allegations**

Plaintiff alleges that, on January 18, 2025, Defendant Chad Youker implemented a policy to seize all Bibles and religious books, including AA books. (Doc. No. 6-1).[4] Plaintiff alleges that inmates' access to religious books was limited to kiosks and tablets and that such access was privileged and restricted. (*Id.*). According to Plaintiff, Defendant returned physical Bibles on November 25, 2025, but AA books are still not allowed. (Doc. Nos. 7 at 2, 25 at 11).

Next, Plaintiff alleges jail staff seized his study Bible[5] and placed him in "the hole" for exercising his religious beliefs. (Doc. No. 7 at 3). Plaintiff reports conflicting dates and time frames as to when this occurred. Initially, Plaintiff claims a Williamson County Sheriff's Office

---

[3] Plaintiff seeks to consolidate this case with two other cases in which he is the named Plaintiff: *Gordon v. Williamson County Sheriff's Office* ("Gordon v. WCSO") (M.D. Case No. 3:24-cv-01121) and *Gordon v. Youker* (M.D. Case No. 3:26-cv-620) ("Gordon v. Youker II"). In *Gordon v. WCSO*, Plaintiff makes various sexual abuse and retaliation claims against multiple deputies and others, all of which the defendants deny. That case is currently pending before Judge Waverly D. Crenshaw, Jr. and Magistrate Judge Luke Evans. In *Gordon v. Youker II*, Plaintiff alleges Youker and other deputies interfered with his mail while incarcerated. That case is in the Prison Litigation Reform Act ("PLRA") screening stage and has also been assigned to Judge Crenshaw and Magistrate Judge Evans.

[4] The court has determined that the operative pleading in this case is the Amended Complaint at Doc. No. 6-1. (See Doc. No. 18 at 3).

[5] It is not entirely clear, but it appears that Plaintiff uses the phrase "study Bible" and "Celebrate Recovery" Bible synonymously.

("WCSO") deputy seized his study Bible on March 13, 2026, wrote Plaintiff up, and then placed him in "the hole" for forty-five days. (*Id.*). However, in his Second Emergency Motion, Plaintiff claims he was in "the hole" for thirty days from March 12, 2026 to April 12, 2026. (Doc. No. 13 at 2). Plaintiff believes that he was placed in "the hole" because of his religious beliefs. (Doc. Nos. 7 at 3, 13 at 2).

Plaintiff also alleges that Christian minister visits are no longer allowed at the jail. (Doc. No. 13 at 1). Plaintiff again reports different dates as to when Christian minister visits stopped, but allegedly it was sometime in April of 2026. Plaintiff states that Williamson County Jail has allowed minister visits for the past thirty-four years, and the minister at issue has been an active member of the prison ministry for multiple years. (*Id.* at 3). However, sometime in April of 2026, Plaintiff claims there was a question of the minister's credentials and minister visits are now fully restricted. (*Id.*). Plaintiff alleges that the minister had "completed and passed all required screenings," but does not have a PhD in Theology. (*Id.* at 4). He alleges this restriction is retaliation for Plaintiff's Christian beliefs. (*Id.*).

Plaintiff claims Defendant gave testimony on April 17, 2026, admitting that he stole Plaintiff's legal mail and punished Plaintiff for having a Bible. (Doc. No. 25 at 1). He further contends Defendant placed him in segregated housing less than a week later based on his religious beliefs. (*Id.*).

As a result of these allegations, Plaintiff requests access to physical Bibles and AA books; a tablet containing the law library, Bibles, and AA books; regular Christian minister visits; the ability to attend church, Bible study, and AA meetings; to be placed back in general population; and to order Defendant to stop interfering with his mail. (Doc. Nos. 7, 13, 20, 25, 29).

4

## B. Defendant's Response

Defendant presents his version of the facts in response to Plaintiff's PI motions.

### 1. *Plaintiff's History in Williamson County Jail*

Plaintiff first entered the Williamson County Jail following his arrest for domestic violence on November 30, 2022. (Doc. No. 38, June 22, 2026 Affidavit of Captain Chad Youker ("Youker Aff.") at 2, ¶ 4). He was booked and released on additional charges on December 6, 2022; February 8, 2023; February 23, 2023; and March 20, 2023. (*Id.*). He returned to the jail from March 21, 2023 through April 11, 2023. (*Id.*). He was booked and released on May 31, 2023 and August 18, 2023. (*Id.*). Following a revocation of his bond, he was returned to the jail on September 1, 2023 where he remains. (*Id.*).

On September 28, 2023, during routine review of inmate video visitations, a deputy flagged videos from Gordon that were harassing in nature. (Doc. No. 38, Youker Aff. at 2, ¶ 5). The video visits were between Gordon and Erin Mishkin. (*Id.*). At the time of his arrest, Erin Mishkin, a woman with whom Gordon had a prior relationship[6] was identified as the victim of domestic violence and Gordon was not to communicate with her. (*Id.*, Ex. A). During Gordon's incarceration, jail staff became aware that he had been communicating with the victim through phone calls, text messages, video chats, and written mail. (*Id.* at 2, ¶¶ 5-10, Ex. A-F). The deputy blocked video chat access for Gordon and blocked the victim's phone number so he could not call or text her. (*Id.* at 2, ¶ 5, Ex. A).

---

[6] Gordon refers to the victim as his "wife." However, state court records show that the two were never married. Rather, Gordon forged the signatures of an officiant and witness on a marriage license in an effort to falsify the existence of a marriage. The "witness" whose name was forged by Gordon was Gordon's father, who had died years before the date on the marriage license. (Doc. No. 37-7, *Mishkin v. Gordon*, No. 23CV-52319, Williamson County Chancery Court, Memorandum and Order filed March 15, 2024).

On September 28, 2023, another deputy learned that Gordon was sending letters to his victim through legal mail. (Doc. No. 38, Youker Aff. at 2, ¶ 6). The deputy intercepted two letters that identified the recipient as "Law Office of John Ballard", but the address was Gordon's home address, where the victim was still living. (*Id.*). The deputy opened the mail and recognized that it was not legal mail, but rather letters to his victim. (*Id.*). Further investigation revealed that Gordon contacted the victim by video chat, even though she told him several times to stop contacting her. (*Id.*). Gordon was verbally abusive to her. (*Id.*). Gordon was written up for violations of jail policies as a result. (*Id.* at 2, ¶ 6, Ex. B).

On October 2, 2023, a deputy intercepted another letter marked as legal mail to "Law Office of John Ballard" with Gordon's home address, where the victim was still living. (Doc. No. 38, Youker Aff. at 3, ¶ 7). The envelope did not contain legal mail but rather contained letters to his victim again. (*Id.*). Gordon was charged with another disciplinary infraction. (*Id.* at 3, ¶ 7, Ex. C).

On December 18, 2023, a confidential informant gave a deputy a letter informing the deputy that Gordon was attempting to pass mail to and receive mail from his victim. (Doc. No. 38, Youker Aff. at 3, ¶ 8). An investigation confirmed that Gordon attempted to use another inmate's name to send out a letter to the victim. (*Id.*). Gordon received another disciplinary infraction. (*Id.* at 3, ¶ 8, Ex. D).

On April 9, 2024, Youker received a call from the Assistant District Attorney prosecuting Gordon's cases ("ADA"). (Doc. No. 38, Youker Aff. at 3, ¶ 9). The ADA explained that a letter sent out from the jail around April 1, 2024 by Gordon was addressed to a private school attended by his victim's children. (*Id.*). Gordon is not the father of the children and had no reason to contact the school. (*Id.*).

6

On April 11, 2024, Franklin Police Department's dispatch reported to a deputy that Franklin police responded to a call that Gordon wrote a letter from the jail to another woman, who had a Temporary Protection Order against him. (Doc. No. 38, Youker Aff. at 3-4, ¶ 10, Ex. F).

On April 11, 2024, Youker received a public records request from Gordon, seeking all information pertaining to his victim's arrest history, child custody case, civil and criminal proceedings, and other police reports with her name or address, along with all records of communications between Gordon and the victim. (Doc. No. 38, Youker Aff. at 3, ¶ 10). Because he was aware of the protective order, Youker contacted the ADA about the request. (*Id.*). The victim sent Youker a copy of the Order of Protection and requested that the information not be provided to Gordon. (*Id.*).

The ADA also stated that Gordon had been attempting to communicate with one of his former attorneys, who also has an Order of Protection against him. (Doc. No. 38, Youker Aff. at 3, ¶ 9, Ex. E). Gordon was issued another disciplinary charge for harassment via mail. (*Id.* at 3, ¶ 10, Ex. E).

During a Williamson County Criminal Court hearing on August 20, 2025, the State asked the court for an order prohibiting Gordon from contacting anyone outside the jail except for the Public Defender's office either by phone, text, email or written mail. (Doc. No. 37-1, Transcript of *State v. Gordon*, Williamson County Criminal Court Case B-CR230655, Aug. 20, 2025 Hearing ("8.20.2025 Transcript"), 6:21-7:3). The State explained that the night before the hearing, the victim received a package at her house of adult women's diapers with a note that said, "The 20th will be a hoot." (Doc. No. 37-1, 8.20.2025 Transcript 7:17-11:9). The victim testified that she understood the package and message to be a threat to her safety if she testified at the August 20 hearing. (Doc. No. 37-1, 8.20.2025 Transcript 233:1-235:4). The victim explained that the diapers

were a reference to something Gordon would say to her when he hit her, "put on your big girl panties." (Doc. No. 37-1, 8.20.2025 Transcript 234:8-19). The State read text messages sent and received from Gordon through the jail's messaging system arranging for someone outside the jail to deliver the package to the victim. (Doc. No. 37-1, 8.20.2025 Transcript 7:22-9:13). The court found that Gordon was involved in sending the diapers and that he was using other people to harass the victim. (Doc. No. 37-2, Transcript of *State v. Gordon*, Williamson County Criminal Court, Apr. 17, 2026 Hearing ("4.17.2026 Transcript"), 64:12-65:22). The State further explained that Gordon used legal mail on prior occasions to contact the victim. (Doc. No. 37-1, 8.20.2025 Transcript 10:2-12). He also mislabeled mail to his father and grandmother as "legal mail", writing "esquire" at the end of their names. (Doc. No. 37-1, 8.20.2025 Transcript 10:11-11:9). At the hearing, Youker described the methods Gordon used to contact the victim from the jail, which included labeling mail "legal" and sending it to her and using other inmates to send mail to the victim. (Doc. No. 37-1, 8.20.2025 Transcript 287:10-294:3).

Following the hearing, the court entered an "Order for Jail to Restrict Defendant's Ability to Text/Email/Call/Video Call/Mail/Legal Mail", wherein the court found that Gordon abused the jail's communication system and ordered that the Sheriff's Office restrict his ability to communicate outside the jail via text, email, phone call, video call, mail, or legal mail with certain exceptions. (Doc. No. 37-1, *State v. Gordon*, Williamson County Criminal Court, Order 8.22.2025). The Order specified that Gordon was solely permitted to correspond with his criminal attorney, civil attorney, opposing counsel in civil cases in which he represents himself pro se, and County, State, and Federal Court Clerk's Offices. (*Id.*).

Gordon continued to misuse the communication systems in the jail, and the State filed a motion to enforce the court's August 22, 2025 Order. The motion was heard on April 17, 2026.

(Doc. No. 37-2, 4.17.2026 Transcript). Youker was called to testify. The State presented video and documentary evidence that Gordon mislabeled mail as "legal mail" and used the kiosk log-in information of other inmates to send and receive messages with individuals who were not on the allowed contacts list in derogation of the court's August 22, 2025 Order. (*Id.*).

The court found that Gordon used the kiosk log-in information of other inmates to circumvent the court's prior order restricting his electronic communications and that his housing in general population with many other inmates made it difficult for the jail to monitor and prevent such activity. (Doc. No. 37-4, *State v. Gordon*, Williamson County Criminal Court, 4.23.2026 Order Regarding Defendant's Communications). The court ordered that Gordon is prohibited from using all forms of electronic communication pending further orders of the court. (*Id.*). He is permitted to communicate with approved persons outside of the jail by physical mail only. (*Id.*).

Following the hearing, Gordon was moved to a smaller general population pod. (Doc. No. 38, Youker Aff. at 4, ¶ 11). Other inmates are housed in the pod, but there are fewer of them, so his kiosk and mail use can be more closely monitored. (*Id.*). When Gordon was informed of the impending move, he became upset, refused to follow the directives of jail staff, etc. and was issued a disciplinary infraction. (*Id.* at 4, ¶ 12, Ex. G). He had a hearing before the Disciplinary Board and was found guilty. (*Id.* at 4, ¶ 12). After serving the disciplinary board time, his privileges were restored. (*Id.*). He has all the normal privileges of general population, except those specifically limited by the court Order in the interest of protecting his victim. (*Id.*).

### 2. *Plaintiff's Allegations of Religious Restrictions*

The Williamson County Jail implemented a program in December 2024 where inmates were provided with tablets for their use while housed in the jail. (Doc. No. 42, June 29, 2026 Affidavit of Chad Youker ("Youker Aff. 6/29/2026") at 2, ¶ 4). The tablets contain over fifteen

Case 3:26-cv-00046    Document 61    Filed 07/22/26    Page 9 of 30 PageID #: 1444

religious texts that are free to inmates, including different versions of the Bible and the AA Big Book.[7] (*Id.* at 2, ¶ 5). Prior to distributing the tablets, upon request, inmates were given paper copies of the Bible (or other religious text of their choosing) to keep in their cells. (*Id.*). The tablets are distributed to inmates each morning around 7:00 or 8:00 a.m. (*Id.* at 3, ¶ 8). The tablets are collected around 8:30 or 9:00 p.m. and stored overnight until they are redistributed the following morning. (*Id.*). Therefore, inmates have the tablet with access to free religious texts for more than twelve hours each day. (*Id.*).

In the jail, it is desirable to reduce the amount of paper that inmates have in their cells for several reasons: books and papers can be used to hide[8] contraband, they present fire safety concerns, inmates use books and paper to cover lights, windows, or cameras, they can be used to clog toilets or as makeshift weapons or armor in the event of a riot or other disturbance. (Doc. No. 42, Youker Aff. 6/29/2026 at 2, ¶ 6). Before the tablets were introduced, inmates were permitted to have two books in their cell in addition to a religious text. (*Id.*). The distribution of the tablets containing religious texts provided an opportunity to remove paper versions of religious texts that had been provided by the jail from inmates' cells. (*Id.*). Inmates who did not have access to a tablet due to a loss of privileges or other reasons were provided a paper copy of the religious text of their choosing, upon request. (*Id.*). Inmates with tablet access were still permitted to have two books of their choosing in their cells and could choose religious texts if they wished. (*Id.*).

Out of an abundance of caution, following the court's November 25, 2025 Order in *Dobbs v. Youker*, M.D. Tenn. No. 3:25-cv-01172, the jail again supplied inmates with paper copies of the

---

[7] The "Big Book," officially titled *Alcoholics Anonymous*, is the foundational text of the 12-Step recovery program. *See*  (last visited on July 20, 2026).

[8] The court takes judicial notice that books can be used to contain contraband as well.

Bible (or other religious texts) and continues to do so. (Doc. No. 42, Youker Aff. 6/29/2026 at 3, ¶ 9). Plaintiff has had and continues to have daily access to an electronic version of the Bible and a physical copy. (*Id.* at 3, 5, ¶ ¶ 8, 19).

An incident report reflects that, on March 12, 2026, Plaintiff attended a Bible study. (Doc. No. 42, Youker Aff. 6/29/2026 at 5, ¶ 20, Ex. C). There were ten Bibles that were donated to the Female Celebrate Recovery Group in the classroom on the shelf. (*Id.*). Deputies placed a sign on the shelf stating, "you are not to take any books off this shelf, they are to stay in this classroom." (*Id.*). At the end of the meeting, Plaintiff took a Celebrate Recovery Bible off the shelf, placed it behind his back, and took it to his cell. (*Id.*). On March 13, 2026, Terrie Payne, the Programs Coordinator, went to Plaintiff's cell to retrieve the Bible. (*Id.*). Plaintiff stated, "So I can't have a Bible?" (*Id.*). Ms. Payne responded that Plaintiff did have a Bible and explained that he was not supposed to take the Recovery Bible from the shelf. (*Id.*). Plaintiff then replied, "Oh well, I am going to sue you. That's not a threat that's a promise." (*Id.*). Plaintiff received a disciplinary infraction as a result of his conduct and appeared before the Disciplinary Board, which found him guilty. (*Id.*). He served 30 days in disciplinary segregation. (*Id.*).

Inmates in the jail are permitted to have clergy visits with ordained or licensed ministers. (Doc. No. 42, Youker Aff. 6/29/2026 at 6, ¶ 21). Those visits are different from regular visits in that they allow for contact between the clergy and inmate. (*Id.*). If clergy want to engage in one-on-one inmate visits, they must complete a 90-day visitor request. (*Id.*). Jail staff then conduct a background check, which includes a request for documentation verifying their status (for example, a ministry license, documentation of ordination, or documentation of a church ministry staff position or recent retirement). (*Id.*). Mike Schinnik is a volunteer who facilitates a class in the jail called Celebrate Recovery. It is a faith-based class but is not a church service. (*Id.* at 6, ¶ 22). In

April 2026, it came to the attention of jail command staff that Mr. Schinnik had been participating in one-on-one contact visits with inmates but did not meet the requirements of the jail for clergy visits. (*Id.*). While Mr. Schinnik is no longer permitted to have one-on-one contact visits with inmates, he may still visit with inmates using the regular visitation procedures for the jail and he continues to volunteer with the Celebrate Recovery program. (*Id.*). Further, clergy, including several Christian ministers, who have completed the application process and meet the requirements of the jail, continue to participate in one-on-one visits with inmates. (*Id.*).

**C. <u>Standard for Issuing Preliminary Injunctions</u>**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). When determining whether to issue a preliminary injunction, the court considers four factors: whether the plaintiff has shown a strong likelihood of success on the merits, irreparable harm in the absence of the requested relief, the balance of equities favors him, and public interest favors the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022). Supreme Court precedent describes these four items as requirements, not mere factors to be balanced. *Winter*, 555 U.S. 7, 20. "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g., Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *McNeilly*, 684 F.3d at 614 (upholding denial of preliminary injunction when plaintiff made only a "small

Case 3:26-cv-00046    Document 61    Filed 07/22/26    Page 12 of 30 PageID #: 1447

showing" of evidence); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead relied on mere allegations); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, at *1 n.1 (6th Cir. Jan. 23, 1996) (affirming denial of a preliminary injunction where the district court relied on a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 06-cv-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice."). The decision whether to grant a preliminary injunction is a matter within the discretion of the district court. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).

In his Amended Complaint, Plaintiff advances federal claims under Section 1983 and RLUIPA and a state law claim under Tennessee Code Annotated § 41-21-211. Preliminary injunctive relief is not appropriate because Plaintiff has not shown, with respect to any of his claims, a substantial likelihood of success on the merits, irreparable injury, the balance of equities favors him, or public interest favors the requested relief.[9]

---

[9] In his Emergency Motion for Ex Parte TRO (Doc. No. 20), Plaintiff alleges sexual abuse, retaliation, and interference with his legal mail, none of which are alleged in the Amended Complaint. The court has already held that Plaintiff may not seek relief based on allegations not in the Amended Complaint. (*See* Doc. No. 18). Thus, the motion (Doc. No. 20) will be denied for the reasons set forth in the court's Order of May 6, 2026. (Doc. No. 18).

Plaintiff's Motion to Enforce RLUIPA contends that his current mail restrictions and housing conditions are unconstitutional. (Doc. No. 29). These claims are not alleged in the Amended Complaint. Thus, as with Plaintiff's Emergency Motion for Ex Parte TRO, his Motion to Enforce RLUIPA (Doc. No. 29) will be denied.

**1. Likelihood of Success on the Merits**

**A. Section 1983 Claims**

Title 42 U.S.C. § 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws . . . ." To state a claim under Section 1983, a plaintiff must allege and show two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Panama Heights*, 437 F.3d 527, 533 (6th Cir. 2006)); 42 U.S.C. § 1983.

Plaintiff brings First Amendment Free Exercise claims[10] under Section 1983 against Defendant Youker. "The Free Exercise Clause of the First Amendment . . . provides that 'Congress shall make no law . . . prohibiting the free exercise [of religion].'" *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (quoting U.S. Const. amend. I). However,"[i]nmates' First Amendment right to exercise their religious beliefs may be subjected to reasonable restrictions and limitations." *Joseph v. Campbell*, 10 F. App'x 264, 266 (6th Cir. 2001). "In any free exercise claim, the first question is whether 'the belief or practice asserted is religious in the [plaintiff's] own scheme of things' and is 'sincerely held.'" *Maye*, 915 F.3d 1076, 1083 (quoting *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987)). Where a plaintiff makes this threshold showing, the court must

---

[10] Several of Plaintiff's motions reference the Establishment Clause and at least one motion references an Equal Protection claim (*see, e.g.*, Doc. No. 13 at 5), but neither Plaintiff's original Complaint nor his Amended Complaint alleges Establishment Clause or Equal Protection claims. Defendant, out of an abundance of caution, addressed the merits of a preliminary injunction as to an Establishment Clause claim (*see* Doc. No. 41 at 17 n.9), but the court declines to do so. If Plaintiff wishes to pursue an Establishment Clause or Equal Protection claim, he must do so by filing a motion to amend the complaint along with a proposed amended complaint asserting such claim(s).

14

consider whether a regulation that "impinges on inmates' constitutional rights . . . is reasonably related to legitimate penological interests." *Id*. (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). If not, "the inquiry ends, and the prisoner prevails." *Cavin v. Mich. Dep't of Corr*., 927 F.3d 455, 461 (6th Cir. 2019) (citations omitted). If so, the court balances "(1) whether the prisoner possesses alternative avenues for exercising his religion; (2) whether accommodating the prisoner would affect 'guards and other inmates' or 'the allocation of prison resources generally'; and (3) whether 'obvious, easy alternatives' exist that suggest 'the regulation is not reasonable.'" *Id*. (quoting *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).

Here, the court previously has found that Plaintiff alleges facts from which the court may infer that he has a sincerely held belief that reading and studying the Bible is part of his religious practice. (*See* Doc. No. 18 at 8). That is because Plaintiff alleges he was baptized, attends church services weekly and on religious holidays, and has "a deeply held religious belief to read and the Bible and religious books." (*Id*.) (citing Doc. No. 6-1 at 2). Plaintiff further alleges that he "is a Christian and believes in AA's concept of God as a higher power." (*Id*.) (quoting Doc. No. 7 at 10).[11]

The court turns now to whether a Williamson County Jail regulation exists that "impinges on [Plaintiff's] constitutional rights" and, if so, whether such regulation "is reasonably related to legitimate penological interests." Plaintiff's TRO and PI motions allege that jail bans on the Bible, AA books, and minister visits impinge on his constitutional rights.

---

[11] On February 5, 2025, Plaintiff filed a grievance stating, "I practice AA as my religion. Requesting the AA big book on the tablet." (Doc. No. 42, Youker Aff. 6/29/2026 ¶ 14, Ex. B.). Plaintiff does not allege in his Amended Complaint or PI/TRO motions that AA is his religion.

Beginning with the alleged Bible ban, Plaintiff contends that jail staff seized all physical Bibles on January 18, 2025 and instead uploaded digital copies of the Bible onto electric kiosks and tablets.[12] Plaintiff first alleges that electronic or digital access, as opposed to possession of a physical Bible, impinged on his constitutional rights because access to Bibles on the kiosk or tablet was restricted at times, or for long periods of time. While Plaintiff does not provide more details regarding when access was restricted,[13] Defendant has provided sworn testimony that the tablets are distributed to inmates each morning around 7:00 or 8:00 am and are collected around 8:30 or 9:00 pm.

Defendant also has provided sworn testimony that inmates who lost access to a tablet as a punishment "or [for] other reasons" were provided a paper copy of the religious text of their choosing, upon request (Doc. No. 42, Youker Aff. 6/29/2026, ¶ 6)[14] and that, following the court's

---

[12] In his Affidavit submitted in support of his first PI motion, Plaintiff does not outright allege that he had no access to the Bible at all; rather, he alleges that his digital access was often restricted. (Doc. No. 7 at 17). In response to Defendant's Motion to Dismiss, Plaintiff now asserts that he has "zero access to a Bible or AA book." (*See* Doc. No. 51 at 3). Leaving for now the question of whether it is appropriate for Plaintiff to assert a new claim in response to a motion to dismiss, Plaintiff simply did not make this claim in his pending "emergency" motions.

[13] Other Williamson County jail inmates have alleged in their complaints before this court that there was a lengthy period of time during which they had no access to Bibles in any form. Plaintiff, however, made no such claim until his Response to Defendant's Motion to Dismiss in which he alleges that "*all* access [to the Bible] was restricted for some eight months." (Doc. No. 51 at 8, 11) (emphasis added). Plaintiff's newest allegation—that he was deprived of all access to a Bible for a period of eight months—directly contradicts the sworn statement of Youker and previous allegations by Plaintiff. (*See, e.g.,* Doc. No. 7 at 3, 7, 11; Doc. No. 13 at 2; Doc. No. 25 at 5, 11, 14). For purposes of Plaintiff's motions seeking preliminary injunctive and TRO relief, Plaintiff has not met his burden of demonstrating that the challenged policies substantially burdened his religion. However, that is a different question than whether a genuine issue of material facts exists as to the period of time, if any, that Plaintiff had absolutely no access to a Bible in any form.

[14] Given Plaintiff's response to Defendant's Motion to Dismiss (*see* Doc. No. 51 at 11), Plaintiff was either unaware of his right to request paper copies of the Bible or other religious texts or chose not to avail himself of the opportunity. *See id.* ("Bibles were fully restricted for eight months. They did not exist physically or digitally nor can Youker prove otherwise. It was not until December 2025 that Bible were returned.") These disputed issues of fact are not appropriate for the court to

16

November 25, 2025 Order in *Dobbs v. Youker*, M.D. Tenn. No. 3:25-cv-01172, the jail again supplied inmates with paper copies of the Bible and continues to do so. (Doc. No. 42, Youker Aff. 6/29/2026, ¶ 9).

The record before the court at the time Plaintiff filed his motions pursuing emergency relief shows that Plaintiff has had and continues to have daily access to an electronic version of the Bible and/or a physical copy of the Bible, although perhaps not his preferred version. (Doc. No. 42, Youker Aff. 6/29/2026, ¶ ¶ 8, 19).

For purposes of Plaintiff's motions seeking injunctive relief, Plaintiff has not demonstrated a substantial likelihood of success on the merits[15] of a free exercise claim under Section 1983, based on the circumstances as described by Plaintiff. That is because Plaintiff has not demonstrated that the jail policy at issue imposed a "significant burden" on his exercise of religion. *Welch v. Spaulding*, 627 F. App'x 479 (6th Cir. 2015). "A burden is substantial where it (1) forces an individual to choose between following the tenets of his religion and foregoing governmental benefits or (2) places 'substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]'" *Mims v. Gillam*, No. 2:23-cv-133, 2023 U.S. Dist. LEXIS 183708, at *6 (E.D. Tenn. 2023) (quoting *Living Water Church of God v. Carter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007)). "The Supreme Court has made clear that the 'substantial burden' hurdle is high." Id. "[P]risons do not have to respond to every religious request of an inmate; it must only allow prisoners a reasonable opportunity to exercise their faith." *Fulkerson v. Williamson Cnty.*, No.

---

resolve when ruling on Plaintiff's motions for preliminary injunctive relief, and Plaintiff did not make these arguments in his motions seeking such relief.

[15] The court already has found that Plaintiff states a colorable First Amendment free exercise claim against Defendant Youker. However, the PLRA screening standard is lower than the standard for granting a preliminary injunction.

17

3:24-cv-00105, 2024 U.S. Dist. LEXIS 115485 (M.D. Tenn. July 1, 2024) (quoting *Cregg Mitchell-Feazell v. Campbell Cnty. Jail*, 2022 U.S. Dist. LEXIS 81724 (E.D. Tenn. May 5, 2022)).

Here, based on the evidence before the court at the time Plaintiff filed his "emergency" motions, even when Plaintiff did not have access to a physical copy of the Bible, he had access to a digital version of the Bible for more than twelve hours a day. Thus, the jail's policy did not substantially burden his exercise of religion. *See Lisasuain v. Hillsborough Cty. Dep't of Corr.*, No. 12-cv-490-PB, 2013 U.S. Dist. LEXIS 70425, at *14 (D.N.H. May 6, 2013) (providing access to Bible and rosary beads for an hour every day was not an unreasonable burden and therefore inmate failed to state a claim under the First Amendment or RLUIPA); *Tyler v. Ray*, No. 9:17-01471-MGL, 2018 U.S. Dist. LEXIS 155969, at *11 (D.S.C. Sep. 12, 2018) (restrictions preventing the plaintiff from bringing his Bible and literature to recreation did not constitute a substantial burden upon his exercise of religion under the First Amendment or RLUIPA); *Scott v. Mecklenburg Corr. Ctr.*, No. 7:06cv000367, 2006 U.S. Dist. LEXIS 49905, at *4 (W.D. Va. July 21, 2006) (no First Amendment violation where inmate's access to his Bible was limited during recreation).

When Plaintiff sometimes lost his access to a kiosk or tablet as a punishment, he could have requested and received a paper copy of the religious text of his choice. *See Mims*, 2023 U.S. Dist. LEXIS 183708, at *6 (finding that inmate identifying as Muslim had not demonstrated that the denial of his personal copy of the Koran substantially burdened his ability to observe any central tenet of the Islamic faith); *see also Hayes v. Tennessee*, 424 F. App'x 546, 554 (6th Cir. 2011) (affirming grant of summary judgment to defendants because prisoner-plaintiff "did not present evidence sufficient to demonstrate that Defendants' rejection of his requested religious literature was for reasons other than taking reasonable measures to maintain prison security.").

18

"Inmates' First Amendment right to exercise their religious beliefs may be subjected to reasonable restrictions and limitations." *Joseph v. Campbell*, 10 F. App'x 264, 266 (6th Cir. 2001) (citing *Bell v. Wolfish*, 441 U.S. 520, 549-50 (1979)). Prisoners have a constitutional right to exercise their religion, but "the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs." *Hayes v. Tennessee*, 424 F. App'x 546, 549 (6th Cir. 2011) (quoting *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985)). The Supreme Court has held that, in most circumstances, prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Plaintiff next alleges that, even when jail staff provided him with a physical Bible,[16] it was the King James version instead of the Celebrate Recovery Bible recommended for him by a jail minister. According to Plaintiff, the Celebrate Recovery Bible is written "in plain English." (Doc. No. 7 at 3). Plaintiff states that he "does not speak, read, or write 'Old English' nor does he speak Latin, Spanish, or Hindi, etc. Thus, making the forced offer a non-starter. Effectively offering a Bible in another language is no real offer, placing a 'substantial burden' on Plaintiff's religious beliefs." (*Id.*) While Plaintiff may prefer the Celebrate Recovery Bible to the King James Version of the Bible, Plaintiff has not persuaded the court that he is unable to read the King James Version such that it places a substantial burden on his exercise of religion. Moreover, Defendant has presented sworn testimony that Plaintiff may request paper copies of the religious text of his choice, which presumably includes the Celebrate Recovery Bible.[17] *See Baucom v. Blount Cty.*

---

[16] It is unclear if Plaintiff is referring to the "paper copies" of the Bible available upon request to inmates after the electronic tablets and kiosks were implemented.

[17] Defendant has not argued that the Celebrate Recovery Bible does not constitute a religious text due to its particular annotations, commentaries, or prefaces.

19

*Det. Facility*, No. 3:21-CV-140-CEA-DCP, 2021 U.S. Dist. LEXIS 110372 (E.D. Tenn. June 14, 2021) (dismissing prisoner-plaintiff's free exercise claim where prison refused to obtain religious texts relevant to his Odinist faith, holding that "Plaintiff does not allege that he has been denied the ability to engage in any aspect of his religious faith other than the facility's failure to produce a copy of certain religious texts . . . . Further, Plaintiff does not allege that he has been denied permission to have [someone else] bring him a copy of those texts."); *see also Nance v. Seabolt*, No. 1:22CV20, 2023 U.S. Dist. LEXIS 34938, at *13-14 (M.D.N.C. Mar. 1, 2023) (finding that prisoner plaintiff failed to state a First Amendment free exercise claim where jail denied him access to a NIV Study Bible provided by his family but provided him with Life Recovery Bible and a NIV Bible; "Not having access to a specific study Bible does not constitute a substantial burden on Plaintiff's religious practice.").

Plaintiff's allegation that Defendant conceded Plaintiff was "punished for taking a Bible to his cell" (Doc. No. at 5) does not tell the whole story. In March 2026, Plaintiff was placed in disciplinary segregation for 30 days after taking a Celebrate Recovery Bible that had been donated for the female recovery group when a sign on the bookshelf specifically instructed that the books were not to leave the classroom. (Doc. No. 41 at 12). Thus, Plaintiff was punished because he failed to follow the instruction to leave the Celebrate Bible in the recovery group classroom, not because he possessed a Bible in his cell or otherwise engaged in the exercise of his religion.[18]

---

[18] Plaintiff alleges that he "walked through three security check points, pat downs, while on camera holding the Bible in clear sight." (Doc. No. 51 at 6). The fact that Plaintiff was not immediately punished for removing the Bible from the recovery classroom does not negate the fact that he removed the Bible from the classroom in violation of a posted sign. Plaintiff alleges that "[t]he Fourth Ave Church of Christ donated the Bibles and minister gave permission to use the Bible" (*Id.*). Even if true, that does not mean Plaintiff can disobey a posted sign and *remove* the Bible from the recovery classroom. At the very least, a genuine issue of material fact exists as to whether the church donated a Celebrate Recovery Bible for Plaintiff in accordance with jail rules.

20

While Plaintiff alleges that the restrictions on his access to AA books substantially burden his exercise of religion, he has not persuaded the court of the substantial likelihood of success on the merits of this claim either. AA is not the religion claimed by Plaintiff, and Plaintiff has access—in one way or another for at least twelve hours a day—to the fundamental religious text of his professed religion, the Bible. In any event, Defendant provided sworn testimony that inmates can access the AA Big Book on the tablets provided by the jail.

Moving now to the alleged minister ban, Defendant has presented sworn testimony that there is no minister ban at the jail. Instead, one particular minister is no longer allowed contact visits as he does not meet the jail's requirements to be placed on the authorized minister visitation list. That minister is still allowed to lead Celebrate Recovery meetings with inmates and to visit inmates subject to the same visitation policies and procedures applicable to all other visitors. Several Christian ministers who meet the jail's requirements continue to participate in minister visits. Restrictions on inmates' free exercise of their religion, such as the Williamson County Jail's religious visitor policies, have been found to be permissible. *Huddleston v. Wilson Cnty. Crim. Justice Complex*, No. 3:14-1552, 2016 U.S. Dist. LEXIS 46598, at *9 (M.D. Tenn. 2016) (holding that "[p]olicies requiring the approval of religious volunteers in a correctional institution have been found not to constitute a substantial burden under RLUIPA, which affords stronger religious protections to prisoners than Section 1983). Jail staff are not required to provide inmates with the best possible means of exercising their religious beliefs, nor are inmates entitled under the First Amendment to have religious leaders of their own choosing. *See id*.; *see also Jones v. S. Health Partners*, No. 3:18-1397, 2020 U.S. Dist. LEXIS 44342, at * 3 (M.D. Tenn. 2020) (finding it to be a "mere inconvenience" rather than a "substantial burden" for plaintiff when there was a ban on

21

church services in the jail; inmates could study the Bible in their cells or receive individual minister visits by request).

Plaintiff's mail and housing restrictions were imposed pursuant to a state court order addressing Plaintiff's misconduct. Those restrictions are unrelated to any religious belief or practice. They are also unrelated to any claim made by Plaintiff in his Amended Complaint.

Plaintiff has not demonstrated that the jail policies at issue were a substantial burden on his right to exercise his Christian faith.

### B. RLUIPA Claims

RLUIPA provides stronger protection for the religious liberty of incarcerated individuals than the First Amendment. *Colvin v. Caruso*, 605 F.3d 282, 296 (6th Cir. 2010) (citing *Lovelace v. Lee*, 472 F.3d 174, 199-200 (4th Cir. 2006)). To state a claim under RLUIPA, a prisoner must (1) "demonstrate that he seeks to exercise religion out of a 'sincerely held religious belief'" and (2) "show that the government substantially burdened that religious exercise." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019) (quoting *Holt v. Hobbs*, 574 U.S. 352, 361 (2015)). If the prisoner satisfies these elements, then the burden shifts to the government to show "that the burden furthers 'a compelling government interest' and 'is the least restrictive means' of doing so." *Id.* (quoting 42 U.S.C. § 2000cc-1(a)).

The phrase "substantial burden" is not defined in RLUIPA. "The Sixth Circuit Court of Appeals has relied upon the Act's legislative history to conclude that the term has the same meaning under RLUIPA as provided by the Supreme Court in its 'free exercise' decisions." *Brown v. Washington*, 2025 U.S. Dist. LEXIS 71202, at *10 (Apr. 15, 2025) (citing *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733-34 (6th Cir. 2007)).

22

A practice will not be considered to infringe on a prisoner's free exercise of religion unless it "place[s] a substantial burden on the observation of a central religious belief or practice . . . ." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). "[T]he Supreme Court has made clear that the 'substantial burden' hurdle is high." *Living Water*, 258 F. App'x at 734. "[A] 'substantial burden' is a difficult threshold to cross." *Id*. at 736. Such a burden "must place more than an inconvenience on religious exercise." *Id*. at 739 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2014)). A particular government action will not be considered a substantial burden merely because it "may make [the] religious exercise more expensive or difficult." *Id*. A burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water*, 258 F. App'x at 733-34 (citations omitted); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).

As with Plaintiff's free exercise claims under Section 1983, Plaintiff has not demonstrated that providing electronic versions of the Bible instead of physical copies substantially burdened his religious exercise. According to Defendant's sworn statement, Plaintiff can read the Bible on a kiosk or tablet, request paper copies of the Celebrate Recovery Bible he prefers, or read the physical King James Version of the Bible provided by the jail. He can purchase a Bible of his choice or have someone mail him a paper Bible.[19] The AA Big Book is available to him. Minister

---

[19] In his response in opposition to Defendant's Motion to Dismiss, Plaintiff contends that he "has been prohibited from purchasing a Bible or have someone mail a Bible." (Doc. No. 51 at 11). Again, Plaintiff failed to make these allegations in his motions for preliminary injunctive relief.

visits are not banned. The individual Plaintiff references is not a minster, and Plaintiff continues to have access to visits from that individual through the jail's ordinary visitation procedures.

Plaintiff has not demonstrated a substantial likelihood of success on his RLUIPA claims.

### C. Tennessee Law

Tennessee Code Annotated § 41-21-211 provides, "Each inmate shall be provided with a Bible, which the inmate may be permitted to peruse in the inmate's cell at such times as the inmate is not required to perform prison labor." In *Ha-Min v. Montgomery Cty. Sheriff's,*[20] 440 F. Supp. 2d 715, 717 (M.D. Tenn. 2006), the defendant sheriff's department conceded that the statute, dating unamended from 1829, violates the Establishment Clause. However, the court is unaware of any court ruling to that effect.[21]

Defendant argues that Tenn. Code Ann. § 41-21-211 does not create a private right of action. For legislation enacted by the Tennessee General Assembly to create or confer a private right of action, "the legislation must contain express language creating or conferring the right." Tenn. Code Ann. § 1-3-119. Alternatively, a private right of action can be created by implication through the statute's structure and legislative history. *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010).

A private right of action allows a person to sue to remedy a wrong or prevent a wrong caused by another party's violation or threatened violation of a statute. *See Hardy v. Tournament Players Club, Inc.*, 513 S.W.3d 427, 433 (Tenn. 2017). "It is the exclusive province of the

---

[20] Although the named defendants in this case are law enforcement officers of the Montgomery County Sheriff's Department, the case name does not contain the word "Department."

[21] Defendant represents in multiple filings that this statute has been found unconstitutional, citing the *Ha-Min* case. (*See, e.g.*, Doc. No. 54 at 4). *Ha-Min* does not so hold. Neither do the two other cases cited by Defendant for that proposition. (*See id.* at 4) (citing *Wilson v. Morgan*, 477 F.3d 326, 332 (6th Cir 2007); *Harrill v. Blount Cnty.*, 55 F.3d 1123, 1125-26 (6th Cir. 1995)).

24

legislature—not the courts—to create a statutory private right of action." *Affordable Constr. Srvcs., Inc., v Auto-Owners Ins. Co.*, 621 S.W.3d 693, 696 (Tenn. 2021) (citations omitted). To bring a cause of action to enforce a statutory duty such as the duty to provide inmates with Bibles, the plaintiff must show that the legislature intended for a private right of action to exist. *See Hardy*, 513 S.W.3d at 434.

The court's own research did not reveal any cases addressing whether the statute at issue confers a private right of action. It may be appropriate at a later stage of this litigation to certify the question to the Tennessee Supreme Court. However, for purposes of determining whether Plaintiff is entitled to preliminary injunctive relief as to this claim, the court finds that he is not. Defendant has submitted sworn testimony that Plaintiff has access to a Bible in a soft-copy physical form or in pages within his cell twenty-four hours per day.

**2. Irreparable Harm**

Plaintiff has failed to prove that he would suffer irreparable harm without injunctive relief as to his federal and state claims.

Irreparable harm must be "both certain and immediate," not "speculative or theoretical." *Nacco Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). The irreparable injury requirement, is "indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).

"When determining whether to issue injunctive relief, a threat of an immediate, irreparable harm must be present." *McLearn v. Wyndham Resort Dev. Corp.*, No. 3:19-cv-00004, 2020 U.S. Dist. LEXIS 42581, at *23 (M.D. Tenn. 2020) (citing Fed. R. Civ. P. 65(b)(1)(A)). "Not every injury constitutes 'irreparable harm.'" *Livingston Educ. Serv. Agency v. Becerra*, No. 22-cv-10127,

2022 U.S. Dist. LEXIS 66152, at *5 (E.D. Mich. 2022). In determining whether a party will suffer irreparable harm, courts generally consider "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *See Mich. Coal*, 945 F.2d 150, 154 (citing *Ohio ex rel. Celebrezze v. Nuclear Regulatory Com.*, 812 F.2d 288, 290 (6th Cir. 1987)).

Where plaintiffs "have not shown a sufficiently strong likelihood of success on the merits," they are unlikely to have "shown irreparable harm." *Johnson v. Wickersham*, No. 13-13672, 2014 U.S. Dist. LEXIS 138771, 2014 WL 4897387, at *3 (E.D. Mich. Sept. 11, 2014), *report and recommendation adopted*, No. 13-CV-13672, 2014 U.S. Dist. LEXIS 137601, 2014 WL 4897433 (E.D. Mich. Sept. 30, 2014). Thus, where a plaintiff is unlikely "to demonstrate that he has a cognizable constitutional claim . . . [the] argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit." *Overstreet*, 305 F.3d at 578.

Here, as described above, Plaintiff has not shown a likelihood of success on the merits of his Section 1983, RLUIPA, or Tennessee state law claims and therefore is not entitled to a presumption of irreparable harm such as to entitle him to injunctive relief. Further, Plaintiff cannot establish irreparable harm because the challenged actions have not prevented him from practicing his religion. The evidence before the court at the time Plaintiff filed his PI motions shows that Plaintiff has had, and continues to have, daily access to a Bible in one form or another.

Despite now changing his argument, Plaintiff has acknowledged that the alleged "Bible Ban" (during which Plaintiff had access to electronic versions of the Bible and other religious books or could request paper copies if his digital access was restricted) ended on November 25, 2025, and physical copies of Bibles were made available to inmates by December 2025. When a Celebrate Recovery Bible was confiscated following a rule violation in March of 2026, Plaintiff

26

continued to have access to both a physical Bible and an electronic version on his tablet. Plaintiff complains about the King James version, but several versions of the Bible are available on the kiosks and tablets, as well as the AA Big Book. Additionally, Plaintiff may obtain a physical copy of the Celebrate Recovery Bible if he follows jail rules. Pursuant to WCSO policy, books, including religious texts, can be purchased by the inmate or a family member/friend of the inmate from a list of approved sources with certain limitations. The same is true for AA books.

Plaintiff's allegation that minister visits are completely restricted is unsupported by the record. The individual whom Plaintiff references is not a minister, but Plaintiff remains able to receive visits from that individual through the jail's ordinary visitation procedures. Because Plaintiff continues to have access to religious materials and opportunities for religious exercise, he cannot show that he will suffer irreparable harm absent injunctive relief, which is fatal to his claim for injunctive relief.

### 3. Balance of Equities & Public Interest

The last two factors can be considered together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (when it is the government that opposes injunctive relief, the third and fourth elements for a preliminary injunction merge, and the court must balance any harm with the public interest).

Given that Plaintiff has failed to prove that he is likely to succeed on the merits, he has also failed to prove that the equities are in his favor.

The court is required to proceed with the utmost care and must recognize the unique nature of the jail or prison setting. *See Kendrick v. Bland,* 740 F.2d 432, 438, n.3 (6th Cir. 1984). Courts must accord jail administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Ward v. Dyke,* 58 F.3d 271, 273 (6th Cir. 1995). Correctional

27

officials are professional experts in matters of security and discipline; as such they are better suited to make decisions about security and discipline than are the courts. *Bell v. Wolfish,* 441 U.S. 520, 547 (1979); *Griffin v. Berghuis*, 563 F. App'x 411, 417-18 (6th Cir. 2014) (any relief that "would remove from prison officials the defense that they are generally afforded in the administration and control of the prison" would necessarily be disruptive and harmful). Moreover, "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548. For these reasons, a plaintiff attacking administrative decisions about issues of security and discipline must meet a heavy burden.

To grant Plaintiff's request for injunctive relief (which includes a request for this court to order jail officials to return Plaintiff to general population) would not only be highly disruptive to the Williamson County Jail but would be contrary to the public's interest in an orderly jail system run by professionals. *See Perry*, 2023 WL 406054, at *6 (finding that "[t]he public interest would not be served by this federal court interfering with the internal operation of a state prison."); *Cage v. Corr. Med. Servs., Inc*., No. 1:09-cv-512, 2010 WL 4684000 (W.D. Mich. Nov. 10, 2010) ("The public interest would not be served by issuing a preliminary injunction or TRO, and the issuance of either form of relief would constitute unwarranted federal court interference with the State's operation of its prisons."). These two factors weigh against Plaintiff.

### 4. Conclusion

Plaintiff has not met his burden of showing that the "circumstances clearly demand" he is entitled to the "extraordinary remedy" of a preliminary injunction. *Overstreet*, 305 F.3d 566, 573. His request for such relief will be denied.

28

## III. MOTION TO STAY

Defendant asks the court to stay proceedings pending the resolution of his Motion to Dismiss. (Doc. No. 45). Defendant states that his motion is based upon qualified immunity defenses and that proceeding with discovery would impinge upon the protections from participating in discovery that are afforded to government officials while such motions are pending. Defendant contends that all claims against him in his individual capacity are barred by the defense of quality immunity. Further, Defendant contends that, as to the claims against him in his official capacity, the determination of his individual capacity entitlement to qualified immunity will be dispositive.

Defendant's Motion to Stay is well taken and will be granted.

## IV. CONCLUSION

For the reasons explained herein, the court rules as follows.

Plaintiff's Motions for Preliminary Injunction ("PI") (Doc. Nos. 7, 13, 25) are **DENIED**.

Plaintiff's "Emergency Motion for Ex Parte TRO & Preliminary Injunction" (Doc. No. 20) and Motion to Enforce RLUIPA (Doc. No. 29) are **DENIED**.

Defendant's Motion to Stay (Doc. No. 45) is **GRANTED**. This case will be **STAYED** pending the resolution of Defendant's Motion to Dismiss (Doc. No. 41).

Plaintiff's four Motions to Join Complaints and Consolidate (Doc. Nos. 9, 24, 29, 33), Motion for Sanctions (Doc. No. 36), and Motion for Class Action Certification and Class Definition (Doc. No. 12) remain pending and will be addressed by the Magistrate Judge by way

29

of a Report & Recommendation, if appropriate, along with or after Defendant's Motion to Dismiss (Doc. No. 43).

It is so **ORDERED**.

_____
Aleta A. Trauger
United States District Judge